AMEEN, Plaintiff in error, v. STATE, Defendant in error.

*No. State 112. Argued April 1, 1971.—Decided May 7, 1971.*
(Also reported in 186 N. W. 2d 206.)

[8] *Huebner v. State, supra; Buchanan v. State* (1969), 41 Wis. 2d 460, 164 N. W. 2d 253.

176

For the plaintiff in error there were briefs and oral argument by *James H. McDermott,* state public defender.

For the defendant in error the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *E. Michael McCann,* district attorney of Milwaukee county.

ROBERT W. HANSEN, J. The conviction of the defendant on the charge of first-degree murder is challenged on a number of grounds, each of which will be dealt with separately.

*Confession as rebuttal.*

On rebuttal, after the defendant had taken the stand to testify that he could not recall any of the events of the shooting and could not recall telling the police anything about the shooting, the state called Police Officer Watters as a rebuttal witness. He testified as to inculpatory statements made by the defendant at the time of arrest, including the defendant's describing in detail the events leading up to the killing, and his admission that he shot the deceased with his brother-in-law's pistol and that he did so because he "did not like" the deceased. Prior to such rebuttal testimony, a *Goodchild* hearing was held as to admissibility of statements made by the defendant at the time of his arrest.

Postconviction counsel argues that the presenting as rebuttal evidence of statements made by defendant, inconsistent with his witness stand testimony, gives such statements a "blockbuster" dimension. The contention appears to be that all statements made by the defendant must be introduced as part of the case in chief, and, if not so presented, may not be offered as rebuttal testimony. Quite aside from the considerable discretion given trial courts in controlling what evidence may be admitted in rebuttal,[1] whatever merit there may have been in the argument made vanished with the recent United States Supreme Court decision in *Harris v. New York*.[2]

[1] " 'The determination of what is admissible on rebuttal is primarily for the discretion of the trial court. The court may even admit in rebuttal evidence which should have been introduced upon the examination in chief, provided the adverse party is allowed to reply thereto. . . .' " *See State v. Watson* (1970), 46 Wis. 2d 492, 500, 175 N. W. 2d 244.

[2] *Harris v. New York* (1971), 401 U. S. 222, 91 Sup. Ct. 643, 28 L. Ed. 2d 1.

In *Harris,* the nation's highest court held admissible in rebuttal self-impeaching statements of the defendant that were not and could not have been made part of the case in chief for the state. No warning of a right to appointed counsel was given before the questions were put to Harris by the police when he was taken into custody. The prosecution conceded that the statements, for this reason, were inadmissible under the *Miranda* rule,[3] and made no effort to use them in presenting the case for the state. When the defendant took the stand in his own defense and denied making the sale of heroin to an undercover police officer, he was asked, on cross-examination, whether he had made specified statements to the police immediately following his arrest that partially contradicted his direct testimony at trial. He testified that he could not remember any of the questions or answers recited. While both counsel argued the substance of the impeaching statements, the trial court instructed the jury that the statements attributed to the defendant could be considered only in passing on defendant's credibility. The nation's highest court upheld the procedure followed, holding that *Miranda* barred the prosecution only ". . . from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel." [4] Specifically, the court permitted the impeaching statements made by the defendant to the police, inadmissible in the case in chief, to be used for impeachment purposes on rebuttal.[5]

---

[3] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

[4] "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." *Id.* at page 224.

[5] ". . . Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petition-

In *Harris,* the statements made by defendant to the police were not and could not have been used by the state as part of the case in chief. Here the statements made by the defendant to the police were not presented as part of the case in chief, but could have been. In both situations, as well as to the shades of grey in between where the state may not be sure as to admissibility of statements made, *Harris* controls and to use such statements in rebuttal only is to do ". . . no more than utilize the traditional truth-testing devices of the adversary process. . . ." [6] The defendant here was entitled to take the stand in his own defense, or to refuse to do so, but, when he elected to testify, he cannot be insulated from ". . . the risk of confrontation with prior inconsistent utterances. . . ." [7]

*Manslaughter as alternative.*

The defendant at the time of trial requested the submission to the jury of manslaughter as an alternative or lesser included charge. The request was denied by the trial court. There is in this state no ". . . near automatic inclusion of all lesser but included offenses as additional

---

er's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Id.* at page 225.

[6] *Id.* at page 225, the footnote thereto commenting: "If, for example, an accused confessed fully to a homicide and led the police to the body of the victim under circumstances making his confession inadmissible, the petitioner would have us allow that accused to take the stand and blandly deny every fact disclosed to the police or discovered as a 'fruit' of his confession, free from confrontation with his prior statements and acts. The voluntariness of the confession would, on this thesis, be totally irrelevant. We reject such an extravagant extension of the Constitution. . . ." Fn. 2, page 225.

[7] *Id.* at page 226.

options to a jury. . . ." [8] Rather, it is "[o]nly if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury. . . ." [9]

Here the defendant contends that a reasonable view of the evidence would warrant finding the killing to have been accomplished without the intent to kill and while in the heat of passion, bringing it within the manslaughter statute. [10] The trial court held that there was no reasonable ground in the evidence for submission of manslaughter to the jury, and we agree.

The crime of manslaughter as the causing of the death of another human being without intent to kill and while in the heat of passion, has been defined as:

" ' "That which will constitute the 'heat of passion' which will reduce what would otherwise be murder to manslaughter 'is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him

---

[8] *State v. Bergenthal* (1970), 47 Wis. 2d 668, 675, 178 N. W. 2d 16, giving the rationale of the rule as follows: " '. . . if the evidence, in one reasonable view, would suffice to prove guilt of the higher degree beyond a reasonable doubt, and if, under a different, but reasonable view, the evidence would suffice to prove guilt of the lower degree beyond a reasonable doubt, but leave a reasonable doubt as to some element included in the higher degree but not in the lower, the court should, if requested, submit the lower degree as well as the higher. . . .' " (Page 674, citing *Zenou v. State* (1958), 4 Wis. 2d 655, 668, 91 N. W. 2d 208.)

[9] *Id.* at page 675.

[10] Sec. 940.05, Stats., in pertinent part, provides: "940.05. Manslaughter. Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years:

"(1) Without intent to kill and while in the heat of passion; . . ."

incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition. . . .' " ' " [11]

The defendant's claim to having acted while in the "heat of passion" has a far more fragile foundation than that present in the *Lucynski Case*. There was involved a wronged husband, outraged by the conduct and threats of his cuckolder. Here the defendant testified that he had just met the deceased, and was not angry with him. He testified that Lulu Belle was not his girl friend, and she testified that he was not her boy friend, and that she had never gone out alone with him. Even if some contest between defendant and deceased for the attentions of Lulu Belle is locatable in the record, it falls far short of the reasonable, adequate provocation required to reduce murder to manslaughter while in the heat of passion.[12] The test is objective, not subjective. The inquiry is not as to whether this defendant was angry at someone or about something at the time he shot and killed the deceased. The question to be asked is whether there existed such provocation as would have caused the state of mind claimed in an ordinary person under the same circumstances. Here such adequate provocation is entirely absent, and the request for submission of a manslaughter

[11] *State v. Lucynski* (1970), 48 Wis. 2d 232, 234, 179 N. W. 2d 889. *See also: Weston v. State* (1965), 28 Wis. 2d 136, 144, 135 N. W. 2d 820; *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N. W. 2d 721.

[12] " 'The provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " 21 Am. & Eng. Ency. of Law (2d ed.), 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N. W. 55; *State v. Hoyt* (1964), 21 Wis. 2d 284, 290, 124 N. W. 2d 47, 128 N. W. 2d 645; *Weston v. State, supra,* at page 144.

verdict was properly denied. We need not reach the question of whether the ten minutes between the defendant leaving the living room and returning to the back door was adequate time or opportunity for negating the provocation.[13] It is not necessary to determine opportunities for cooling off, where there was no adequate reason established for heating up.

*Instruction on intoxication.*

With respect to the charge of first-degree murder, the trial court instructed the jury as to the defense of intoxication. No instruction as to the defense of intoxication was given as to the charge of second-degree murder. Considered together, the statute as to intoxication as a defense,[14] and the statute defining second-degree murder,[15] raise the issue as to whether "conduct . . . evincing a depraved mind," constitutes a "state of mind essential to the crime." Does the definition of second-degree murder require that the conduct be such as evinces a depraved mind, or does it require that the state of mind referred to be established as a prerequisite to conviction? In a case preceding the adoption of the existing statute, this court held that a homicide, otherwise

---

[13] "The passion which renders the killing of a person voluntary manslaughter must have continued to exist until the commission of the homicidal act; if, from any circumstances whatever, it appears that the party reflected, deliberated, or cooled any period of time before the fatal stroke was given, or if in legal presumption there was time or opportunity for cooling, the killing will amount to murder, . . ." 40 Am. Jur. 2d, *Homicide*, p. 360, sec. 68.

[14] Sec. 939.42, Stats., in pertinent part provides: "An intoxicated or a drugged condition of the actor is a defense only if such condition: . . .

"(2) Negatives the existence of a state of mind essential to the crime."

[15] Sec. 940.02, Stats., in pertinent part provides: "**Second-degree murder.** Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

constituting first-degree murder, if committed by one too intoxicated to form a premeditated design to kill, is reduced to murder in the second degree.[16] We do not see that statute as being intended [17] or resulting in any change in the *Lasecki* result. Intoxication, if established to the degree required, negatives intent and reduces murder in the first degree to murder in the second. It is not a defense to the charge of second degree for, under the statute (sec. 939.42, Stats.) as before, the reference in the second-degree murder statute (sec. 940.02) is to conduct, evincing a certain state of mind, not requiring the existence of such state of mind in the actor at the time of the crime. Aside from the failure of the defendant to request the court to instruct the jury on intoxication as a defense to second-degree murder,[18] we hold the trial court properly instructed as to the defense of intoxication as to first-degree murder, and properly did not repeat the instruction on the charge of second-degree murder. Incidentally, where the jury by finding the defendant guilty of first-degree murder, found that he was not sufficiently intoxicated to negative intent to murder, it found against the defendant on the defense of intoxication as and where it was raised at the time of trial.

*Competence of counsel.*

Par for the course these days is an attack upon the competence of trial counsel on appeal of criminal court convictions. Even the ablest of attorneys in the criminal law field are accustomed to having their judgment as to trial tactics challenged by postconviction counsel. The

[16] *Lasecki v. State* (1926), 190 Wis. 274, 208 N. W. 868.

[17] The 1953 Legislative Council Report, Vol. III, The Criminal Code, page 34, with regard to sec. 939.42 (2), Stats., states that this section "is a restatement of the old law in this state."

[18] *See: Flowers v. State* (1969), 43 Wis. 2d 352, 361, 168 N. W. 2d 843; *Pamanet v. State* (1971), 49 Wis. 2d 501, 510, 182 N. W. 2d 459.

implication seems to be that something must have been wrong with trial strategies that were followed by a conviction. The implied suggestion is that a different game plan would have led to a different result. Not necessarily so. If the Monday morning quarterback's substitute strategy were to have been followed in Saturday's football game, the result might well have been the same—but the margin of defeat far greater. That appears to be the situation here, for what postconviction counsel indicates he would have done had he been trial counsel, appears to us likely only to have shortened the time in which a verdict of guilty was reached. Here are the substitute strategies urged:

(1) Where trial counsel stipulated to introduction of a two-page ballistics report of the FBI on cartridge cases found at the scene, bullets found in the deceased's body and the pistol found in defendant's possession, postconviction counsel would not have so stipulated. By stipulating to a report containing inconclusive findings, trial counsel avoided the appearance of an expert witness who might have strengthened, rather than weakened, the probative value of the findings.

(2) At the trial Lulu Belle testified she heard the shots after she got up from the couch. At the preliminary hearing, she testified that she heard the shots while she was still on the couch. Postconviction counsel would have sought to impeach her testimony based on such "inconsistency." Any advantage thus gained had to be weighed against the triviality of the undertaking and the immateriality on the defense of intoxication.

(3) Postconviction counsel would have done more with a confusion as to the exact obscene word used by the defendant in admitting the shooting. The complaint signed by Detective Buttoni stated that the defendant, in the presence of Detective Bayer, said, "I shot the ......," the epithet referring to one's parents not being married. Another witness recalled the same phrase being used by

defendant. However, Officer Watters testified that the defendant said, "I shot the ...... ......," the missing words referring to an affinity for incestuous behavior. Postconviction counsel would have called the two detectives to establish that the defendant actually used the presumably less offensive of the two slang words involved, neither a term of respect nor regard. The thought occurs that, in so doing, he would have additionally twice impressed upon the jury the admission of the shooting by the defendant. The epithet or epitaph given deceased by defendant is hardly as damning as the admission that he shot and killed the deceased.

(4) Lulu Belle's sister, Shirley Figlinski, testified to coming downstairs after the shooting with one Donald Sardina. Sardina was called as a witness but failed to appear. The failure to subpoena Sardina is termed ineffectiveness of counsel since he must have observed defendant and his testimony might have been helpful. The contention rests on pure speculation. There is no way of knowing whether Sardina observed defendant or whether what he would have said would have been helpful or harmful to defendant's case.

Additionally, postconviction counsel faults the trial attorney for failing to raise at trial all of the issues he raised on this appeal. The contentions as advanced for the first time on appeal have been found to be without merit; they would have gained neither soundness nor substance by being earlier raised.

*Adequacy of proof.*

The other standard challenge to convictions in criminal cases is that the evidence was not sufficient to establish the defendant's guilt beyond any reasonable doubt. Here the claim is that inconsistencies between testimony of eyewitness Lulu Belle and arresting Officer Watters renders the officer's testimony incredible. The inconsistencies are trivial, rendered more so, because Lulu Belle

testified to what went on in the house, and the officer to what defendant did and said when he was placed under arrest. The claim is made that the state was required to call as witnesses all four officers who participated in defendant's arrest, not just two of them. Not so. This court has clearly held that the state does not have the burden of producing every possible eyewitness.[19] Nor is it required to produce all officers who had anything to do with placing the defendant under arrest. Inferences, if any, to be drawn from the absence of a particular witness, along with issues as to credibility, are for the trier of fact to decide. Clearly the evidence in this record is amply sufficient to support the finding of guilt of the defendant on the charge of murder in the first degree.

*By the Court.*—Judgment and order affirmed.

---

[19] ". . . This court has held that the state does not have the burden of producing every possible eyewitness. . . . The absence of an available witness does not as a matter of law render the testimony of others insufficient to sustain a finding of guilt." *Quinn v. State* (1971), 50 Wis. 2d 96, 99, 183 N. W. 2d 61, 63.